## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| | : | **Criminal Case:  20-87 (TSC)** |
| **v.** | : | |
| | : | |
| | : | |
| **Jun Wei YEO, also known as** | : | |
| **Dickson YEO,** | : | |
| | : | |
| **Defendant.** | : | |

## <u>UNITED STATES' MEMORANDUM IN AID OF SENTENCING</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, hereby respectfully submits its Memorandum in Aid of Sentencing for defendant Jun Wei Yeo.  The defendant is before the Court having entered a plea of guilty to a one-count Information charging him with acting as an agent of a foreign government and foreign official, in violation of 18 U.S.C. § 951.  For the reasons stated herein, the government submits that an appropriate sentence in this case is 30 months' incarceration prior to taking the defendant's cooperation into account.  Given the defendant's cooperation, the government respectfully submits that a sentence of 16 months' incarceration is appropriate.

## I.    FACTUAL SUMMARY

Defendant Jun Wei Yeo, a Singaporean national, worked under the direction and control of operatives from the People's Republic of China (PRC) intelligence service (PRCIS) from 2015 to 2019.  The defendant's mission was to obtain valuable nonpublic information from the United States about matters of economic, military, and political importance, and then provide that information to his PRCIS handlers.  To accomplish that mission, Yeo used the internet and social media to find U.S. citizens who were likely to have access to valuable information, such as U.S.

1

military and government employees with high-level security clearances.  Yeo then recruited these individuals to write reports.  Yeo claimed that the reports would be sent to clients in Asia.  He did not reveal to the authors that the reports were being sent to the PRC government.  Yeo often re-wrote the reports to meet the specifications and preferences of his PRCIS handlers.  Yeo honed his recruitment skills with guidance from his PRCIS handlers, focusing on the U.S. targets' financial insecurities, job dissatisfaction, and other psychological vulnerabilities.

Yeo's work for the PRCIS occurred within a larger context of China's ongoing theft of information from the United States.  The PRC government is engaged in a whole-of-state program to steal U.S. information and technology.  Yeo, a highly educated Ph.D. candidate, understood that his work on behalf of the PRCIS contributed to a much larger effort to diminish American power and influence relative to China.  After his arrest, Yeo conceded that he was motivated to work for the PRCIS, in part, because he was ideologically aligned with China's goal of diminishing U.S. influence in international affairs.

Yeo provided his PRCIS handlers with numerous reports in the course of his criminal conduct, including reports on a U.S. military aircraft program, the withdrawal of U.S. troops from Afghanistan, and the religious affiliation of a specific member of the Cabinet of the United States. The government believes Yeo was arrested before he was able to obtain any classified information.

It is difficult to assess the degree of damage that Yeo's work has caused to U.S. national security.  However, his intent was clear, and so was his effort.  Yeo intended to exploit U.S. citizens, steal nonpublic information, and aid the PRC's efforts to weaken American influence. Yeo devoted himself to this mission.  He said the task of identifying U.S. targets was like an addiction.  He worked enthusiastically on this criminal project over multiple years.

An appropriate sentence in this case should take into account the ongoing nature of Yeo's

criminal conduct, its potential to damage our national security, and the need to deter other individuals from partaking in the PRC's scheme to steal our information. It should also take into account the substantial assistance that Yeo provided to the U.S. government after he was approached by law enforcement. Yeo was debriefed by U.S. law enforcement officials for over 40 hours and provided information that is credible and helpful. The information that Yeo provided included valuable intelligence and furthered criminal investigations.

**A.** **The PRC Government Is Engaged in a Whole-of-State Effort to Steal from the United States.**

"The greatest long-term threat to our nation's information and intellectual property, and to our economic vitality, is the counterintelligence and economic espionage threat from China." Speech of FBI Director Christopher Wray, (July 7, 2020), available at https:// www.fbi.gov/news/ speeches/the-threat-posed-by-the-chinese-government-and-the-chinese-communist-party-to-the-economic-and-national-security-of-the-united-states. China's malign activities constitute "a threat to our economic security—and by extension, to our national security." *Id.*

The scale of this threat is massive. "[T]he FBI is opening a new China-related counterintelligence case about every 10 hours. Of the nearly 5,000 active FBI counterintelligence cases currently underway across the country, almost half are related to China." *Id.* The net effect is that the people of the United States "are the victims of what amounts to Chinese theft on a scale so massive that it represents one of the largest transfers of wealth in human history." *Id.*

Yet, China's theft of American information and technology is not merely about material wealth. "China is engaged in a whole-of-state effort to become the world's only superpower by any means necessary." *Id.*

**B.** **Yeo Was Recruited by the PRCIS in 2015.**

Yeo was first recruited by PRCIS operatives in Beijing, China, in 2015. At the time, Yeo

3

was studying to receive his Ph.D. in Public Policy from the National University of Singapore.  Yeo traveled to Beijing to give a presentation on the political situation in Southeast Asia.  After the presentation, Yeo was approached by individuals who claimed to be representatives from think tanks based in China.  Yeo came to understand that at least four of these individuals were actually operatives of the PRCIS.

Yeo agreed to work for the PRCIS operatives.  The operatives offered Yeo money in exchange for nonpublic information about matters of economics and geopolitics.  Initially, Yeo was tasked with focusing on economic and geopolitical matters in Southeast Asia.  Then, he was tasked with focusing on the United States.  The intelligence operatives were clear that they wanted nonpublic information, which they sometimes referred to as "scuttlebutt."

Yeo had multiple motives for working with PRCIS.  After his arrest, Yeo admitted that he was motivated, in part, by an ideological alignment with the PRC's goal of diminishing U.S. geopolitical power and influence.  In addition to his ideological motives, Yeo was motivated by greed and was paid for his work with the PRCIS.  Yeo also admitted that his academic career was flagging and that he was concerned about his job prospects after graduate school.  Working for the PRCIS operatives made him feel important and valued.

C. **Yeo Used the Internet and Social Media to Identify U.S. Citizens to Target.**

To fulfill his taskings, Yeo used the internet and social media to identify U.S. citizens from whom he could potentially extract information.  For example, Yeo used a professional networking website where members share their career and employment information.  Yeo searched for individuals whose resumes and job descriptions suggested they were likely to have access to valuable, nonpublic information, such as U.S. military and government personnel with high-level security clearances.  The professional networking website enabled Yeo to browse hundreds and

perhaps thousands of potential targets with ease.  The professional networking website also enabled Yeo to contact these targets via direct message.  Moreover, as Yeo began to send messages, the website's algorithm suggested additional potential contacts, thereby increasing Yeo's ability to spot and assess promising targets.  According to Yeo, the website's algorithm was relentless.  Yeo stated that it felt almost like an addiction.  He checked the professional networking website almost daily to review the new batch of potential contacts.

Yeo also created a fake job posting to attract potential targets.  One of the PRCIS operatives instructed Yeo to create a fake consulting company and then advertise job openings for the company online.  Yeo did as instructed.  For his fake consulting company, Yeo used the same name as a prominent U.S. consulting firm that conducts public and government relations.  Yeo later informed U.S. law enforcement that, in response to the fake job posting, Yeo received over 400 resumes.  According to Yeo, 90% of the resumes he received were from U.S. military and government personnel with security clearances.  Yeo passed the most promising resumes to one of his PRCIS handlers.

### D. Yeo Exploited Networking Opportunities in Washington, D.C. to Identify Targets.

In addition to online activity, Yeo traveled to the United States to continue his efforts. Living in the Washington, D.C. area from approximately January 2019 to July 2019, Yeo exploited networking opportunities in the area to spot and assess individuals from whom he could extract information.  Yeo attended multiple events and speaking engagements at D.C.-area think tanks. While networking in the United States, Yeo also made contact with several individuals from lobbying firms and defense contracting companies.

### E. Yeo Recruited Targets with Guidance from the PRCIS Operatives.

After Yeo identified potential targets, he worked to recruit them.  Yeo honed his ability to

recruit targets with guidance from his PRCIS operatives.  Yeo learned to focus on the targets' vulnerabilities, including whether the targets were dissatisfied with work, were having financial troubles, or had children to support.  Yeo also focused on building rapport and trust with his targets. Yeo successfully recruited multiple U.S. citizens to provide him with information.

**F.  <u>Yeo Obtained Information from U.S. Persons.</u>**

Yeo obtained information of economic, military, and political importance, and passed that information to the PRCIS.  For example, Yeo successfully recruited U.S. Person 1, a civilian with a high-level security clearance working with the United States Air Force on the F-35B military aircraft program.  U.S. Person 1 provided Yeo information about the geopolitical implications of the Japanese purchasing the F-35 aircraft from the United States.  Yeo then drafted a report on that information and sent it to one or more of his PRCIS contacts.

Yeo also successfully recruited U.S. Person 2, an officer in the United States Army who was assigned to the Pentagon at the time.  U.S. Person 2 sent his resume to Yeo in response to the job posting for Yeo's fake consulting company.  Yeo met with U.S. Person 2 in the United States on multiple occasions in an effort to gain his trust. U.S. Person 2 confided to Yeo that he was traumatized by his military tours in Afghanistan.  At Yeo's direction, U.S. Person 2 wrote a report on how the withdrawal of U.S. military forces from Afghanistan would impact China.  Yeo paid $2,000 or more for the report.  The PRCIS reimbursed Yeo for the payment.

Yeo successfully recruited U.S. Person 3, who at the time was employed at the U.S. Department of State.  U.S. Person 3 confided to Yeo that he was feeling dissatisfied at work, was having financial troubles, and was worried about his upcoming retirement.  At Yeo's direction, U.S. Person 3 wrote a report about a then-serving member of the Cabinet of the United States. Yeo paid him $1,000 or $2,000 for the report.

**G.   Yeo Was Preparing to Obtain Classified Information at the Time of his Arrest.**

Before his arrest, Yeo was preparing to obtain classified information from U.S. Person 2. One of the PRCIS operatives directed Yeo to solicit classified information.  The operative also indicated he would pay Yeo more money if Yeo could turn U.S. Person 2 into a permanent conduit of information.  To fulfill this tasking, Yeo returned to the United States in November 2019 with plans to meet with U.S. Person 2 and solicit classified information.  Yeo was arrested before he could fulfill this tasking.

**H.   Yeo Worked for a Foreign Intelligence Service Knowingly and Willfully.**

Yeo worked knowingly and willfully against the United States on behalf of a foreign intelligence service.  The PRCIS operatives were open with Yeo regarding their affiliation with the Chinese government.  One of the operatives told Yeo that he and his boss worked for the PRC's main intelligence unit.  In addition, one of the operatives asked Yeo to sign a contract with the PRC's People's Liberation Army (PLA).  Yeo refused to sign the contract but agreed to continue working with the intelligence operatives.

The PRCIS operatives directed Yeo to practice operational security (Op-Sec), consistent with his status as an intelligence asset.  The PRCIS operatives directed Yeo not to communicate with them when Yeo traveled to the United States for fear that the U.S. government would intercept their communications.  One of the PRCIS operatives instructed Yeo that, if Yeo must email them from the United States, he should do so from a local coffee shop.  A different PRCIS operative directed Yeo not to take his phone and notebooks when traveling to the United States.  This same operative gave Yeo a bankcard so that Yeo could pay his American contacts for the information they provided.  When Yeo was outside the United States, this PRCIS operative communicated with Yeo through the encrypted Chinese messaging application WeChat.  Yeo was instructed to

use multiple phones and to change his WeChat account every time he contacted the PRCIS operatives.

Yeo met with PRCIS operatives in various locations across China.  Yeo met with one of his PRCIS operative approximately 19 times and with another operative approximately 25 times. When Yeo traveled to China for these meetings, he was regularly taken out of the customs line and brought to a separate office for admission into the country.  Yeo raised this issue with one of the PRCIS operatives, who responded by telling Yeo that they wanted to conceal his identity when he traveled into China.

In sum, Yeo understood that his activities targeting the United States were part of a clandestine operation directed by the PRCIS for the benefit of the PRC.

## I.   <u>Yeo's Early Interactions with Law Enforcement.</u>

Yeo was approached by U.S. authorities in November 2019—first by immigration authorities on November 6th and then by law enforcement authorities on November 7th.  As described below, Yeo admitted during the second encounter that he worked for the PRCIS.

On November 6, 2019, Yeo entered the United States by way of John F. Kennedy (JFK) airport and was interviewed by U.S. Customs and Border Protection (CBP) officers.  During the interview, Yeo did not reveal that he was working for the PRCIS.  However, he did tell the CBP officers that he met with civil servants and diplomats to write papers about how China treats smaller strategic states such as Singapore and South Korea.  He added that some his work could be "borderline of corporate espionage."

During his November 2019 visit to the United States, Yeo had planned to meet with U.S. Person 2 and solicit classified information.  After the CBP interview, however, Yeo changed his plan.  After the CBP interview, Yeo contacted all of his China-based contacts via the encrypted

Chinese WeChat application and told them not to contact him for a while.  Yeo then canceled the WeChat access to his phone so the WeChat application could only be accessed from his iPad.  Yeo also contacted U.S. Person 2 and explained that he had been stopped.  Yeo booked a flight to leave the U.S. the following day.

The next day, November 7th, Yeo returned to the airport.  He was approached by FBI agents who asked him to consent to a voluntary interview.  Yeo initially declined to be interviewed and went to board his flight, but then he changed his mind again.  He returned to the FBI agents and agreed to be interviewed.  During the voluntary, non-custodial interview, Yeo was forthcoming about his activities, admitting that he worked for the PRCIS.  After the interview, Yeo agreed to continue meeting with the FBI.  The next day, Yeo was arrested and taken into custody.  After his arrest, Yeo continued to meet with U.S. government officials and answer questions.  He ultimately entered a plea of guilty and provided substantial assistance to law enforcement.  The government will provide the Court with specific information in a supplemental memorandum and motion, which it will seek to file under seal.

## II.   DETERMINING THE SENTENCE

This Court must sentence the defendant consistently with the factors described in 18 U.S.C. § 3553(a).  When weighing the § 3553(a) factors as part of its calculus of an appropriate sentence, the Court should consider not only the nature and circumstances of the offense and the history and characteristics of the defendant, but also the applicable sentencing objectives—they are, that the sentence: (1) reflect the seriousness of the offense; (2) promote respect for the law; (3) provide just punishment; (4) afford adequate deterrence; (5) protect the public; and (6) effectively provide the defendant with needed educational or vocational training and medical care.  *See* 18 U.S.C. § 3553(a)(1) and (2).  In addition, the sentence should reflect "the need to avoid unwarranted

sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).

In *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court ruled that the United States Sentencing Guidelines (U.S.S.G. or Guidelines) are no longer mandatory. However, "[a]s a matter of administration and to secure nationwide consistency, the Sentencing Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Gall v. United States*, 552 U.S. 38, 49 (2007). While, to be sure, "[i]n accord with 18 U.S.C. § 3553(a), the Guidelines, formerly mandatory, now serve as one factor among several courts must consider in determining an appropriate sentence," *Kimbrough v. United States*, 552 U.S. 85, 92 (2007), it remains the case that "the Commission fills an important institutional role: It has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise,'" *id.* at 574 (quoting *United States v. Pruitt*, 502 F.3d 1154, 1171 (10th Cir. 2007) (McConnell, J., concurring)). The Supreme Court "accordingly recognized that, in the ordinary case, the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough*, 552 U.S. at 109 (quoting *Rita v. United States*, 551 U.S. 338, 350 (2007)).

A.     <u>United States Sentencing Guidelines Calculation</u>

Where, as here, the Guidelines do not expressly specify a guideline range for the charge of conviction, a court should "apply the most analogous offense guideline" and "[i]f there is not a sufficiently analogous guideline, the provisions of 18 U.S.C. § 3553 shall control." U.S.S.G. § 2X5.1. The government, the defense, and the Presentence Report all agree that there is no sufficiently analogous guideline for the conduct at issue here. In an unrelated case last year, this Court also determined that there is no sufficiently analogous guideline for 18 U.S.C. § 951 and

that 18 U.S.C. § 3553 controls.  *See United States v. Butina,* 18-CR-218, Doc. 124 (May 1, 2019

D.D.C.).  In addition, the majority of courts that have looked at the issue of what guideline range

to apply to violations of 18 U.S.C. § 951 has determined that there is no sufficiently analogous

guideline.  *See, e.g.*, *United States v. Soueid*, No. 11-CR-494, Doc. 59 (E.D. Va.); *United States v.*

*Chun*, No. 16-CR-618, Doc. 17 at 10 (S.D.N.Y.); *United States v. Alvarez*, No. 05-CR-20943 (S.D.

Fla.); *United States v. Buryakov*, No. 15-CR-73 (S.D.N.Y.), Doc. 158 at 6-7, 17; *United States v.*

*Duran*, No. 07-CR-20999 (S.D. Fla.), Doc. 488 at 42-43.

**B.    Statutory Penalties**

The defendant faces a maximum sentence of ten years' imprisonment and a fine of not

more than $250,000 or twice the pecuniary gain or loss of the offense.  18 U.S.C. §§ 951, 3571(b)

& (d); *see also* PSR at ¶¶ 62, 76.  The Court may impose a period of not more than three years

supervised release but may choose not to impose such period where, as here, the defendant is a

deportable alien.  *Id.* at ¶¶ 65-68.

**C.    Analysis of Factors Enunciated in 18 U.S.C. § 3553(a)**

As discussed in detail below, an analysis of the factors enunciated in 18 U.S.C. § 3553(a)

demonstrates that the imposition of a 30-month period of incarceration would be appropriate for

this offense before taking into account any cooperation.  Because of the defendant's cooperation,

as laid out in this memorandum and the sealed supplement, the government submits that a sentence

of 16 months' incarceration is appropriate.

**1.    The Nature and Circumstances of the Offense**

The defendant's conduct is serious and has threatened U.S. national security.  The

defendant stole sensitive, nonpublic information from the United States and provided that

information to the PRC.  The defendant knowingly and willfully worked for a foreign intelligence

service with the goal of weakening the United States.

11

To accomplish his mission, the defendant used the tools and techniques of espionage, including learning from his PRCIS handlers how to recruit U.S. targets and how to avoid detection by U.S. authorities.

The seriousness of the defendant's criminal conduct is further evidenced by the nature of information he provided to the PRC.  The defendant successfully extracted information about sensitive economic and geopolitical matters, including the F-35 military aircraft program, the withdrawal of U.S. troops from Afghanistan, and a specific member of the Cabinet of the United States.  These are topics central to our national security.  Moreover, if the defendant had continued his criminal scheme without detection, it is likely that he would have improved at spotting and assessing targets, recruiting them, and ultimately exploiting them.  With time, he would have obtained ever more sensitive information and, thus, increased the threat to U.S. national security.

The defendant's criminal conduct lasted years.  The defendant's conviction is not the product of a one-off lapse in judgment.  This was an intensive multi-year project to weaken the United States.  During those years, the defendant worked assiduously, checking social media almost daily to identify new U.S. citizens whom he could target, and then traveling repeatedly to the United States and China to recruit U.S. targets or meet with PRCIS handlers.  The defendant was highly motivated and dedicated to his mission.

The defendant exploited the openness of U.S. society to achieve his criminal ends.  The FBI Director has warned that China is "doing all it can to exploit the openness of [our society] while taking advantage of its own closed system."  Speech of FBI Director Wray, (July 7, 2020), available at www.fbi.gov/news/speeches/the-threat-posed-by-the-chinese-government-and-the-chinese-communist-party-to-the-economic-and-national-security-of-the-united-states.  Here, the defendant exploited a professional networking website that allows legitimate users to share

detailed accounts of their career histories, skill sets, and future professional goals.  This website, working as it should, makes our society stronger, benefitting job seekers, as well as public and private employers looking for the best candidates.  The defendant exploited this tool and used it against us when he scoured this public website to spot and assess hundreds and perhaps thousands of potential victims.

The defendant's culpability is further enhanced by the fact that he understood the larger context in which he was acting.  The defendant is highly educated and highly knowledgeable of geopolitics.  He understands that China seeks to diminish U.S. influence in the world.  Indeed, the defendant has admitted that he was motivated by a desire to help China do just that.  A diminution of U.S. influence relative to China is not simply an abstract idea.  In concrete terms, the lives of American service members are put at risk.  The health and prosperity of American families are put at risk.  Our government's ability to promote American values globally is also put at risk.  The defendant understood that he was helping the PRC to attack and degrade American influence.

In 2019, the U.S. intelligence services published the *Worldwide Threat Assessment of the U.S. Intelligence Community* and identified China, along with Russia, as the leading state intelligence threats to U.S. interest.  2019 Worldwide Threat Assessment, p14, available at https://www.dni.gov/files/ODNI/documents/2019-ATA-SFR---SSCI.pdf.  Recently, Secretary of State Michael Pompeo deemed the PRC a greater threat than Russia.  Speech of Sec. Pompeo (Aug. 12, 2020), available at https://www.state.gov/securing-freedom-in-the-heart-of-europe/. Senator Mark Warner (VA-D) stated that China's rise is "the great foreign policy challenge of our time."  Speech of Sen. Warner (Dec. 18, 2019), available at https://www.c-span.org/_video/ ?467534-1/national-competitiveness-forum-remarks-senator-mark-warner.  Senator John Cornyn (TX-R), referring to China, warned that the United States is "under attack" and that China seeks

"to dominate the United States economically, militarily, and technologically." Statement of Sen. Cornyn, June 19, 2019 Hearing of the Senate Fin. Comm., video available at https://www.finance.senate.gov/hearings/foreign-threats-to-taxpayer_funded-research-oversight-opportunities-and-policy-solutions (statement made at 01:20:50).

The threat posed by the PRC is grave and long-term.  Defendant Yeo willingly became a part of that threat.  He understood what he was doing, and he dedicated himself to his mission.  He used the tradecraft of espionage, and he exploited the openness of American society and the internet.  He devoted years of his labor to undermining the United States, exploiting its citizens, and extracting valuable information.  The information he provided the PRC touched on matters central to our national security.  In sum, the defendant's conduct was serious and warrants a significant sentence.

## 2. <u>The History and Characteristics of the Offender</u>

The defendant is highly educated and capable of making a living through non-criminal means when he is released from incarceration. He has no prior convictions of which the government is aware.

The defendant is a Singaporean national who will be immediately subject to removal.  The PSR did not find a basis to depart downward under *Smith v. United States*, 27 F.3d 649 (D.C. Cir. 1994), and the defense did not object to the absence of such a finding.  The government agrees that a *Smith* departure would not be appropriate in this case.

*Smith* offers two bases for a departure.  The first is that the defendant's status as a deportable alien prevents him from being assigned to serve any part of his sentence at a minimum-security prison.  *Id.* at 651.  Even if the Court imposes a 16-month sentence, the defendant has already served most of his sentence in the D.C. Jail.  Assuming *arguendo* that his federal

designation will be to a higher level than it would have been if he were not a deportable alien, he will not have endured more harsh prison conditions for any appreciable period of time based on his deportable alien status.

The second basis for a *Smith* departure is that the defendant's status as a deportable alien generally renders the defendant ineligible for the benefits of 18 U.S.C. § 3624(c), which directs the Bureau of Prisons, to the extent practicable, to assure that prisoners spend the last ten percent of their sentences (but no more than six months) under conditions that will afford the prisoner a reasonable opportunity to adjust to and prepare for re-entry into the community. *Id.* at 650-51. If the Court imposes a 16-month sentence, then, the maximum departure would be 1.6 months. For the reasons below, even that departure would not be warranted in this case.

As the D.C. Circuit made clear in *Smith*, "For a departure on such a basis to be reasonable[,] the difference in severity must be substantial and the sentencing court must have a high degree of confidence that it will in fact apply for a substantial portion of the defendant's sentence." *Id.* at 655. That is clearly not the case here. The *Smith* court also expressed its belief that "the circumstances justifying a downward departure on account of the deportable alien's severity of confinement may be quite rare." *Id.* Indeed, for this ground to be a basis for departure at all, under the Guidelines, it must be "highly infrequent." *Id.* (citing U.S.S.G., Ch. 1, Pt. A, sec. 4(b)). Here, while it is certainly the case that a U.S. citizen can violate 18 U.S.C. § 951, it is hardly outside the heartland of § 951 offenses that the offender is a deportable foreign national. Because the defendant's status as a deportable alien is comfortably within the heartland of § 951 offenders, there is no basis for a departure.

The government acknowledges that the defendant has provided substantial assistance to the United States and, as detailed in its sealed supplemental memorandum, asks the Court to depart

downward from the sentence it would otherwise impose pursuant to U.S.S.G. § 5K1.1.

### 3.    The Need to Promote Respect for the Law, to Provide Just Punishment, to Afford Adequate Deterrence, and to Protect the Public

Sentencing the defendant to a term of incarceration will serve the governmental interests in providing a just punishment that sufficiently deters others and protects the public. The defendant's actions here were harmful to U.S. national security for the reasons stated above.  The Court can and should deter others who would engage in similar campaigns in the future by treating the defendant's conduct with the seriousness it deserves.

The sentence proposed by the government recognizes that the defendant pleaded guilty early in the case, took responsibility for his actions, and cooperated with the government, as discussed in more detail below.[1]

### 4.    The Need to Provide the Defendant with Educational or Vocational Training

The defendant has no need for additional educational or vocational training.

### 5.    The Need to Avoid Unwarranted Sentencing Disparities Among Defendants with Similar Records who Have Been Found Guilty of Similar Conduct

The starting point in the Court's analysis under § 3553(a)(6) should be to consider the sentences of "defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).  The government acknowledges that sentences for violations of 18 U.S.C. § 951 and conspiracies to commit that offense vary greatly.   But the government's recommendation—that the defendant's conduct warrants a sentence of 30 months' incarceration prior to factoring in cooperation—is within the heartland of sentences imposed across the country

---

[1]    Specifically, the government has factored in that, had the Sentencing Guidelines specified an offense level, Yeo would have been entitled to either a two-level or three-level reduction of that offense level, depending on whether the Total Offense Level was more or less than 16.  *See* U.S.S.G. § 3E1.1.

for similar offenses.  We highlight some non-exhaustive examples below:

- In *United States v. Mariia Butina*, No. 18-CR-218 (D.D.C.), the defendant pleaded guilty to one count of conspiracy to violate 18 U.S.C. § 951, in violation of 18 U.SC. § 371.  The defendant was a Russian national acting within the United States at the direction and control of a foreign government official, working to spot and assess politically powerful and well-connected Americans.  At sentencing, the government proffered that the crime warranted 24 months' incarceration prior to accounting for the defendant's cooperation and 18 months' incarceration once her cooperation was taken into account.  Consistent with that recommendation, the Court imposed a sentence of 18 months.

- In *United States v. Doostdar*, No. 18-CR-255 (D.D.C.), the defendant pleaded guilty to one count of violating § 951 and one count of conspiring to do the same.  The defendant was a dual U.S.-Iranian citizen who admitted to coming to the United States as part of a conspiracy to conduct surveillance on an Iranian opposition group in the United States and to provide information about that group's members to the Government of Iran.  Defendant Doostdar directed his co-defendant, who resided in the United States, on how to conduct the surveillance and how to pass the information to the Government of Iran.  The court sentenced the defendant to 38 months' incarceration on each count, to run concurrently.

- In *United States v. Peng*, No. 4:19-CR-589 (N.D. Cal.), the defendant pleaded guilty to one count of violating § 951, and was sentenced to 48 months' incarceration and fined $30,000, in connection with his acting as an agent of the Chinese Ministry of State Security (MSS).  The defendant admitted as part of his plea that, from 2015-2019, he

would retrieve classified information passed to him by MSS sources within the United States, leave cash for those sources, and fly with the classified information to China to deliver it to Chinese officials.

- In *United States v. Chun*, No. 16-CR-518 (S.D.N.Y.), the defendant pleaded guilty to violating § 951. The defendant was an FBI electronics technician with a Top Secret security clearance who sold sensitive FBI information to Chinese officials over a period of years. The parties agreed that, although there was no sufficiently analogous Guideline, a range of 21-27 months of incarceration was appropriate after factoring in acceptance of responsibility. The court imposed a sentence of 24 months' incarceration.

- In *United States v. Duran*, No. 07-CR-20999 (S.D. Fla.), the defendant was convicted at trial of violating § 951 and conspiring to violate that statute. The government's case established that the defendant came to the United States as an agent of the Venezuelan government in an attempt to bribe and/or extort a U.S. citizen. *See United States v. Duran*, 596 F.3d 1283, 1295-96 (11th Cir. 2010). The court imposed a sentence of 48 months' incarceration on each count, to run concurrently.

- In *United States v. Al-Awadi*, No. 07-CR-20314 (E.D. Mich.), the defendant pleaded guilty to one count of violating § 951, stemming from his work reporting on Iraqi dissidents within the United States for the Iraqi Intelligence Services. The court sentenced the defendant to 18 months' incarceration.

- In *United States v. Dumeisi*, No. 03-CR-664 (N.D. Ill.), the defendant was found guilty at trial of violating § 951, conspiring to violate that statute, and two counts of perjury. The court sentenced the defendant to a total of 46 months' incarceration.

- In *United States v. Buryakov*, No. 15-CR-73 (S.D.N.Y.), the defendant pleaded guilty to violating § 951, stemming from an agreement to take actions within the United States at the direction of a Russian government official. The parties agreed, pursuant to Fed. R. Crim. P. 11(c)(1)(C), to a sentence of 30 months' incarceration. The court accepted that agreement and imposed a sentence of 30 months.

The defendant's actions in this matter are within the same general range as the cases cited above. He agreed to act within the United States at the direction of Chinese intelligence service operatives, and he did indeed so act for a period of approximately four years. The government's recommended sentence of 30 months (prior to factoring in cooperation), with a downward departure to 16 months, based on substantial assistance to the United States, is well within the range of sentences imposed by courts for similar conduct.

### D.    Defendant's Substantial Assistance and Government's Motion for Departure

In determining an appropriate sentence, the Court should also take into account defendant Yeo's cooperation with the government. In particular, the government moves this Court to depart downward under section 5K1.1 of the Sentencing Guidelines based on the defendant's substantial assistance to the United States and to sentence him to 16 months' incarceration.[2]

In assessing the government's request for a reduction in the otherwise appropriate sentence, the Court should consider, among other things, (1) the significance and usefulness of the defendant's assistance; (2) the truthfulness, completeness, and reliability of any information or

---

[2]    As discussed above, the government's position is that there is no Guideline range for this offense, and it continues to ask the Court to find that there is no sufficiently analogous Guideline. We maintain the "depart downward" language for two main reasons: (1) because the government is asking the Court to sentence the defendant to a lesser term of incarceration than the government believes would be appropriate based on the 18 U.S.C. § 3553(a) factors without cooperation; and (2) in the event that the Court disagrees with the parties and finds that a sentencing range does apply, we still urge the Court to depart downward from that range.

testimony provided by the defendant; (3) the nature and extent of the assistance; (4) any injury

suffered, or any danger or risk of injury to the defendant or her family; and (5) the timeliness of

the defendant's assistance.  U.S.S.G. § 5K1.1(a)(1) – (a)(5).  The government has provided details

about the defendant's cooperation in a sealed supplement to this memorandum, and it asks the

Court to take those details into account in fashioning a proper sentence.

## Conclusion

WHEREFORE, the government respectfully recommends that Yeo be sentenced to a term

of imprisonment of 16 months.

Respectfully submitted,

MICHAEL R. SHERWIN
ACTING UNITED STATES ATTORNEY
N.Y. Bar Number 4444188

By: _/s/ Thomas N. Saunders_____
THOMAS N. SAUNDERS
ERIK M. KENERSON
Assistant United States Attorneys
N.Y. Bar Number 4876975 (Saunders)
Ohio Bar Number 82960 (Kenerson)
United States Attorney's Office
555 Fourth Street, NW
Washington, D.C. 20530
Telephone: 202-252-7790
Email: Thomas.Saunders@usdoj.gov

_/s/ David Aaron_____
DAVID AARON
Trial Attorney, National Security Division
N.Y. Bar Number 3949955
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C. 20530
Telephone: 202-233-0986
Email: David.Aaron2@usdoj.gov