UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | 20-CR-0087-01 (TSC) |
| JUN WEI YEO | : | |

## DEFENDANT'S SENTENCING MEMORANDUM

Jun Wei Yeo, through counsel, submits this memorandum in aid of his sentencing hearing, scheduled to occur on October 9, 2020. He pleaded guilty to one count of Acting in the United States as an Illegal Agent of a Foreign Government. He was arrested on November 8, 2019, and thus has been in custody for approximately 11 months. He respectfully requests that the Court sentence him to a period of time-served. Mr. Yeo is very remorseful, and immediately accepted responsibility for his conduct and agreed to plead guilty at the earliest possible time.

Mr. Yeo has been in custody since early November, 2019, under pretrial detention conditions at the D.C. Jail, which, as this Court knows, is far more onerous than serving a sentence after conviction in the Bureau of Prisons. Moreover, since the outbreak of the COVID-19 epidemic in March 2020, those conditions have been even harsher. As a non-citizen, Mr. Yeo also would, if further incarcerated, have no access to programming in the BOP and would be ineligible for release to a halfway house to serve out the final portion of his sentence. Additionally, while the government is attempting to expedite the process, Mr. Yeo is likely to spend at least some time in custody awaiting his removal. Thus, we respectfully requests that the

1

Court sentence Mr. Yeo to a period of time-served, a sentence that after the application of good

time-credit, is only approximately 2 or 3 months less than what the government is requesting.

### **Argument**

When imposing a sentence, the Court must consider:

> (1) the nature and circumstances of the offense and the history and
> characteristics of the defendant;
>
> (2) the need for the sentence imposed –
>
>> (A) to reflect the seriousness of the offense, to promote respect
>> for the law, and to provide just punishment for the offense;
>>
>> (B) to afford adequate deterrence to criminal conduct;
>>
>> (C) to protect the public from further crimes of the defendant;
>> and
>>
>> (D) to provide the defendant with needed educational or
>> vocational training, medical care, or other correctional
>> treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and the sentencing range established for
> [the applicable offense and the applicable category of
> defendant as set forth in the Sentencing Guidelines];
>
> (5) any pertinent policy statement [issued by the Sentencing
> Commission];
>
> (6) the need to avoid unwarranted sentence disparities among
> defendants with similar records who have been found guilty of
> similar conduct; and
>
> (7) the need to provide restitution to any victims of the offense.

*See* 18 U.S.C. § 3553(a); *United States v. Booker*, 543 U.S. 220, 259 (2005).

Congress has further provided that:

> [t]he court, in determining whether to impose a sentence of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in Section 3553(a) to the extent that they are applicable, recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation.

*See* 18 U.S.C. § 3582 (emphasis added).   With that limitation and considering all of the purposes of sentencing, the Court must impose a sentence that is "sufficient, *but not greater than necessary*, to comply with the purposes [of sentencing]." 18 U.S.C. § 3553(a) (emphasis added).

**(1)    The United States Sentencing Guidelines.**

In this case, there are no sentencing guidelines applicable to the offense of conviction, nor are there any closely analogous guidelines that could be used to determine an offense level. As a result, the Court's sentence is to be determined based upon the factors set forth in 18 U.S.C. 3553(a).   See U.S.S.G. § 2X5.1 (court should sentence under provisions of 18 U.S.C. § 3553(a) if there is no analogous guideline); *see also United States v. Campa*, 529 F.3d 980, 1011-12 (11th Cir. 2008) (finding there is no analogous guideline applicable in § 951case); *United States v. Soueid*, No. 11-CR-494 (E.D. Va. 2012) (same); *United States v. Chun*, No. 16-CR-618 (S.D.N.Y. 2016) (same); *United States v. Butina*, (D.D.C. 2019); *United States v. al-Awadi*, (E.D. Mich. 2007).

**(2)    The Nature and Circumstances of the Offense and History and Characteristics of the Defendant.**

The nature of Mr. Yeo's violation supports a sentence of time-served.   Mr. Yeo does not minimize the seriousness of his conduct, and indeed, he fully stands by the description of that conduct in statement of offense that accompanied his guilty plea.   However, the seriousness of the offense should be weighed against the fact that he immediately accepted responsibility by

pleading guilty, and then cooperated fully with the government's investigation. It is also important to note that the work he did was writing academic papers and recruiting others to write academic papers. He had no access to classified information.   Most importantly, after being detained, he held nothing back when describing his own misconduct and repeatedly expressed that he never intended to cause any harm to the interests of the United States any United States citizens, or his own country, Singapore.   He did not betray Singapore, and he does not bear any malice towards the United States or any U.S. citizens.   He was deeply attracted to China and its ability to uplift millions from poverty with industrial policy, which led him to be easily influenced.

Mr. Yeo is a 39 year old Singaporean national. Mr. Yeo suffers from elevated blood pressure and anxiety, depression and PTSD stemming from his service in the military in Singapore. He was being medicated for these conditions at the time of his arrest in this case and currently. At the time of this offense, he was a PhD student, but because of this, will not be able to complete his studies. He has no criminal history and there is little risk of recidivism.   Mr. Yeo was raised in Singapore in an intact family of modest means, by parents who loved, and continue to love, him dearly. His family put a large emphasis on the importance of education. It was this emphasis on education and doing well that caused him to pursue multiple advanced degrees in Singapore and Japan, and to enroll in a doctoral program in the United States.   He was cash-strapped and floundering in his academic pursuits when he was recruited to engage in this conduct.   He deeply regrets having gotten caught up in the swirl of satisfying Chinese intelligence requirements and compromising his own integrity.   During his PhD years, he was lonely, broke, and suffering from disappointment in his academic endeavors.   The Chinese gave

him more respect and dignity for the work he was doing that he was able to obtain from his efforts at academia.   He has acknowledged that he was vulnerable and allowed the Chinese Intelligence operatives to use his skill sets to extract insights on Washington, D.C. He never meant to cause any harm to the United States or any individuals. As a result of his conduct in this case and the tremendous press coverage it received in Singapore, Mr. Yeo's professional reputation is now in ruins and he will have difficultly even securing basic employment. He wants nothing more than to return to a quiet life with his parents.

Of particular moment is the fact that Mr. Yeo immediately expressed remorse and agreed to subject himself to the United States legal system, even at a time that he was completely free to board a plane and leave, thereby avoiding any repercussions.   When he was approached at the airport, he was free to leave.   Nevertheless, he agreed instead to be debriefed by the agents.   He deplaned when he did not have to do so, and fully debriefed.   This exceptional level of acceptance of responsibility and genuine showing of remorse demonstrates that a sentence of time served would be appropriate.

### (3)     The Purposes of Sentencing.

The Sentencing Reform Act requires the Court to impose a sentence that not only will reflect the seriousness of the offense and promote respect for the law, but also will provide just punishment, afford deterrence to criminal conduct, and protect the public from further crimes of the defendant.   Here, the Court can fully achieve these sentencing goals without imposing an additional term of incarceration, and additional incarceration would be unnecessarily harsh due to the Covid-19 epidemic.

The advent of the Coronavirus pandemic has affected sentencing decisions in a marked way.   It has altered the landscape for sentencing in every conceivable way.   18 U.S.C. § 3553(a)(2)(A) provides that the Court must assess "the need for the sentence imposed— . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." As such, as part of its sentencing obligations, this Court must consider the need for the sentence imposed to "provide just punishment for the offense."   COVID is one factor the Court should consider.   If incarcerated further, Mr. Yeo would continue to spend his time essentially in lockdown conditions similar to solitary confinement, subjected to the constant fear of contracting a deadly disease, unable to visit family members or friends,

Since March 13, 2020, BOP modified its operations to respond to the spread of COVID-19 and individuals in every institution" are "secured in their assigned cells/quarters to decrease the spread of the virus. Family and friends are prohibited from visiting.   Programming, absent select UNICOR operations, has ceased and movement throughout the facilities is suspended.  And while BOP's website claims movement exceptions are made to permit showers three times a week, telephone and email access, commissary, and laundry, in reality even these most basic activities are not allowed, and instead, conditions amount to a total lockdown for almost twenty-four hours a day. See Fed. Bureau of Prisons, *Fed. Bureau of Prisons COVID-19 Action Plan* (Mar. 13, 2020), https://www.bop.gov/resources/news/20200313_covid-19.jsp (Phase II). Phase II's modified operations were extended as described in Phase III, Phase IV, Phase V, Phase VI, and Phase VII. Institution lockdown commenced on April 1, 2020 (Phase V) and was subsequently extended through May 18, 2020, (Phase VI) and again through June 30, 2020 (Phase VII). And, at some facilities, once someone tests positive for the virus, they are put in solitary confinement. *See, e.g.*, Class Action Complaint, *Torres v. Milusnic*, No. 20-cv-04450 (C.D. Cal. May 16, 2020), ECF No. 1, at 55 (Declaration of Joanna Perales)

(petitioner placed in Special Housing Unit (SHU) after testing positive for COVID-19); Class Action Petition for Writ of Habeas Corpus, *Hallinan v. Scarantino*, No. 20-hc- 2088-FL (E.D.N.C. May 26, 2020), ECF No. 1-4, at 6 (Declaration of Roger Duane Goodwin) (Petitioner in FCI Butner Medium I moved to the SHU after testing positive for COVID-19).   See also Fed. Bureau of Prisons, *BOP Implementing Modified Operations*, https://www.bop.gov/coronavirus/covid19_status.jsp (last visited May 28, 2020).

CDC guidance, such as social distancing, is simply impossible to achieve in our federal prisons —particularly during a lockdown.   Incarcerated individuals share bathrooms, sinks, showers, and telephones. They eat together, and sleep in close proximity to each other. They lack the freedom to bathe regularly and are unable to effectively disinfect their surroundings. *See e.g.*, Mem. From B. von Blanckensee, Acting Complex Warden FCC Lompoc, to All Staff at FCC Lompoc (Apr. 17, 2020) ("no phone or computer access"), https://bit.ly/3cdgA8H; *Hallinan*, ECF No. 1-4, at 3-4 (Declaration of Roger Duane Goodwin) ("Our unit [in FCI Butner Medium] remains locked down. . . except for about 1 hour on weekdays, when we are allowed to take a walk outside of our unit."); *Torres*, at 22-28 (describing crowded, unsanitary conditions); *Torres*, at 56 (Declaration of Joanna Perales) ("prisoners were not allowed to shower" and "once [prisoners] run out of soap, they cannot purchase any more because the commissary is closed"); *id.* at 59-60 (Declaration of Graciela Zavala-Garcia) ("my son was denied all access to telephones, email and commissary" and "my son has not been able to shower or change into clean clothes"); Class Action Complaint, *Wilson v. Ponce*, No. 20-cv-04451 (C.D. Cal. May 16, 2020), ECF No. 1, at 82-83 (Declaration of Jackeline Vazquez) (describing the crowded and unsanitary living conditions at FCI Terminal Island and declaring

that "my brother was told that prisoners would not be able to use phones and computers until further notice"); Emergency Petition for Writ of Habeas Corpus, *Wilson v. Williams*, No. 20-cv-794 (N.D. Ohio Apr. 13, 2020), ECF No. 1-5, at 3-4 (Declaration of Kendal Nelson) ("[At FCI Elkton] They are not allowing us to go outside and get fresh air, and we're not allowed into the law library."); Letter from Dr. Sandro Galea, Dean, Boston Univ. School of Pub. Health, et al., to President Trump 1 (Mar. 27, 2020), ttps://thejusticecollaborative.com/wp-content/uploads/2020/03/Public-Health-Expert-Letter-to-Trump.pdf (co-signed by numerous public health officials from leading medical and public health institutions); *see also* Ctrs. for Disease Control and Prevention, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, https://bit.ly/2M9IF6a (last visited May 28, 2020) (recognizing that correctional and detention facilities present "unique challenges for control of COVID-19 transmission," due to the fact that individuals "live, work, eat, study, and recreate within congregate environments").

Unsurprisingly, these conditions have fueled the spread of COVID-19 throughout BOP facilities—numerous deaths have occurred and most of those tested within the BOP have the virus. Thus, because of COVID-19, any time Mr. Yeo spends in custody will necessarily be more severe than it ordinarily would.   See e.g., https://www.forbes.com/sites/walterpavlo/2020/07/16/bureau-of-prisons-using-solitary-confinement-as-a-means-to-curb-covid-19-contagion/#685159f193ad. *See also* Fed. Bureau of Prisons, *BOP Implementing Modified Operations*, https://www.bop.gov/coronavirus/covid19_status.jsp (last visited May 28, 2020) (allowing three showers a week); *Williams*, --- F.Supp.3d ---, 2020 WL 1940882, at *3

(N.D. Ohio Apr. 20, 2020) (acknowledging that soap and disinfectant "can only be so useful in an environment where the inmates are constantly in close proximity to one another. Likewise, the education about hygiene and social distancing [BOP] tout[s] is only effective if the inmates have the supplies and physical space to put such knowledge into practice."); Facility Evaluation: Metropolitan Detention Center COVID-19 Response, *Chunn v. Edge*, No. 20-cv-1590 (E.D.N.Y. Apr. 30, 2020), ECF No. 72-1, at 2 ("Detainees [at MDC Brooklyn] do not have access to adequate cleaning solutions or personal protective equipment."); Class Action Complaint, *Torres v. Milusnic*, No. 20-cv-04450 (C.D. Cal. May 16, 2020), ECF No. 1, at 56 (Declaration of Joanna Perales) (plaintiffs and other individuals at Lompoc "do not have access to hand sanitizer, and are only given one bar of soap each week"); *id.* at 66 (Declaration of Nema Zayed Fears) ("Since the COVID-19 outbreak started, a single mask is the only piece of protective equipment that my father has received. He has had to re-use that mask for weeks."); Emergency Petition for Habeas Corpus, *Wilson v. Williams*, No. 20-cv-794 (N.D. Ohio Apr. 13, 2020), ECF No. 1-5, at 3 (Declaration of Kendal Nelson) (describing "unbearabl[ly]" unsanitary conditions).

Under 18 U.S.C. § 3553(a)(2)(D) this Court must also consider "the need for the sentence imposed—. . . to provide the defendant with needed. . . medical care. . . in the most effective manner."   Surely in the middle of a pandemic that is taxing the medical resources of the BOP and communities in which the BOP facilities are located, this is not served by further incarceration.   Even under the best of circumstances, the BOP has struggled to provide medical care. In 2016, for example, DOJ's Office of Inspector General (OIG) found

that BOP experienced chronic medical staffing shortages and failed to take adequate

measures to address them, endangering the safety and security of its institutions.   *See, e.g.,*

U.S. Dep't of Justice Office of the Inspector Gen., *Review of the Federal Bureau of*

*Prisons' Medical Staffing Challenges* i-ii, 1-2 (Mar. 2016),

https://oig.justice.gov/reports/2016/e1602.pdf.   From 2010 to 2014, BOP's total medical

staff was "approximately 17 percent less than what the BOP projected was necessary to

provide what it considers to be 'ideal' care," and 12 institutions were so medically

understaffed that they were described as "crisis level." Id.   Lack of adequate staffing has

resulted in medical personnel and other non-correctional staff working as guards, and has

made wait times for individuals to receive even routine medical care unacceptably long.

Unfortunately, as COVID-19 ravages its facilities, BOP's ability to provide effective

medical care has only gotten worse.   *See* Keegan Hamilton, *Sick Staff, Inmate Transfers,*

*and No Tests How the U.S. is Failing Federal Inmates as Coronavirus Hits*, Vice (Mar. 24,

2020), https://bit.ly/3eq7Rl7; *see also* Oversight of the Federal Bureau of Prisons and

Implementation of the First Step Act of 2018: Hearing before the Subcomm. On Crime,

Terrorism, and Homeland Security of the H. Comm. on the Judiciary, 115th Cong. 3-4

(2019) (statement of Kathleen Hawk Sawyer), https://bit.ly/2ZJlDeG.

Because BOP has failed to implement large-scale testing, it cannot effectively identify

and isolate people with the virus from those who are healthy. Testing capabilities vary from

facility to facility and BOP has failed to implement a testing and isolation protocol for its

staff.   In at least one facility, the virus is so prevalent, that BOP has stopped testing

altogether and instead declared all individuals to be presumed-positive.   BOP has also failed

to provide incarcerated individuals and staff adequate PPE to curb the spread of the virus.

And BOP's "illogical self-defeating" quarantine procedures—which fail to distinguish

between the healthy and sick—are "ungrounded in science, and a danger" to incarcerated

individuals.   "The stark reality is that 'avoiding exposure to COVID-19 is impossible for

most detainees and inmates.'"   See Michael Balsamo, *Over 70% of Tested Inmates in*

*Federal Prisons have COVID-19*, AP News (Apr. 29, 2020), https://bit.ly/2AiMjrF; *See, e.g.*,

Petition for Writ of Habeas Corpus, *Hallinan v. Scarantino*, No. 20-hc-2088-FL (E.D.N.C.

May 26, 2020), ECF No. 1-18, at 7 (Declaration of Dr. Chris Beyrer) ("BOP's actions (or

inaction) fail to follow the most basic infection control measures"); Complaint, *Wilson v.*

*Ponce*, No. 20-cv-4451 (C.D. Cal. May 16, 2020), ECF No. 1, at 99 (Declaration of

Shamsher Samra, MD) ("it is questionable whether the healthcare system at Terminal Island

is even capable of responding to the dire situation it now faces"); Facility Evaluation:

Metropolitan Detention Center COVID-19 Response, *Chunn v. Edge*, No. 20-cv-1590

(E.D.N.Y. Apr. 30, 2020), ECF No. 72-1, at 2 ("Not only is MDC [Brooklyn] ill-equipped to

identify cases of COVID-19 within its population, but it has not implemented adequate

infection control practices.   In fact, it is my assessment that several current practices in

MDC actually promote a more rapid spread of COVID-19. . ."). *see also* Petition for Writ of

Habeas Corpus, *Hallinan v. Scarantino*, No. 20-hc-2088-FL (E.D.N.C. May 26, 2020), ECF

No. 1-18, at 19 (Declaration of Dr. Chris Beyrer) ("There is no widespread testing for

coronavirus at FCC Butner."); *Wilson v. Williams*, --- F.Supp.3d ---, 2020 WL 1940882, at *3

(N.D. Ohio Apr. 20, 2020) (confirming that one facility only had 50 COVID-19 tests for a

population of 2,400, noting that because there are so few tests, "medical staff has needed to

triage test usage"); *United States v. Scparta*, --- F. Supp. 3d ---, 2020 WL 1910481, at *2

(S.D.N.Y. Apr. 20, 2020) (acknowledging confirmed COVID-19 cases on BOP's website but

recognizing that "[t]esting in BOP facilities is severely limited, however, and the real

numbers are likely far higher"). Luke Barr, *Over 5,000 Corrections Officers Have Contracted*

*COVID-19*, ABC News (May 5, 2020), https://abcn.ws/2zlB8hG ("staff are typically tested in

the community"); *see also* AFGE, *A BOP Officer Contracted Coronavirus. He was Told to*

*Return to Work ASAP* (May 4, 2020), https://bit.ly/35KSCjA ("The Bureau of Prisons only

tested inmates, not staff.").   Nicholas Chrastil, *Louisiana Federal Prison No Longer Testing*

*Symptomatic Inmates for Coronavirus due to 'Sustained Transmission'*, The LENS (Mar. 31,

2020), https://bit.ly/2AbNA3P.;   Letter from U.S. Rep. Salud Carbajal, U.S. Sen. Kamala

Harris, and U.S. Sen. Dianne Feinstein to Michael Carvajal, Dir. Fed. Bureau of Prisons 1

(Apr. 21, 2020), https://bit.ly/36yB5LK; AFGE, *A BOP Officer Contracted Coronavirus. He*

*was Told to Return to Work ASAP* (May 4, 2020), https://bit.ly/35KSCjA; Michael Balsamo,

*Over 70% of Tested Inmates in Federal Prisons have COVID-19*, AP News (Apr. 29, 2020),

https://bit.ly/2WNrsEy; James Call, *Correctional Officers File Complaint about Coronavirus*

*at Federal Prison in Tallahassee*, Tallahassee Democrat (Apr. 18, 2020),

https://bit.ly/3drQlfD.

     Finally, Congress directed in 28 U.S.C. § 994(g)*,* that the Commission "take into

account the nature and capacity of the penal, correctional, and other facilities and services

available" and that "the sentencing guidelines . . . shall be formulated to minimize the

likelihood that the Federal prison population will exceed the capacity of Federal prisons."

Despite this obligation, BOP facilities have historically been, and remain, overcrowded.

Adding COVID-19 to the mix has resulted in prisons and jails that are even more dangerous, inhumane, and deadly than before. BOP is simply not equipped to handle this global pandemic. Courts have called BOP's COVID-19 response "an outrage" and "Kafkaesque," confirming that "BOP is struggling to handle this crisis within its prison population." Congress has similarly recognized BOP's failed capacity. On March 27, 2020, Congress passed the CARES Act and authorized the Attorney General to increase the use of home confinement. And before and after the passage of CARES, Congress has repeatedly called on DOJ and BOP to drastically depopulate its prisons and jails. *See, e.g.*, Letter from U.S. Rep. Jerrold Nadler, Chairman Comm. on the Judiciary to Hon. William P. Barr, U.S. Atty. Gen. (Mar. 12, 2020), https://bit.ly/2THldRS ("it would be important, at this time, for DOJ to consider measures that can be taken to reduce the number of prisoners in government custody"); Letter from U.S. Sen. Kamala Harris to Michael Carvajal, Dir., Fed. Bureau of Prisons (Mar. 19, 2020, https://bit.ly/2zA7eGR ("in the midst of this crisis, BOP should be taking reasonable steps to reduce the incarcerated population and guard against potential exposure to coronavirus"); Press release, U.S. Sens. Chuck Grassley & Dick Durbin, *Grassley, Durbin Statement Following Phone Call with Attorney General Regarding Federal Prison System Efforts to Combat COVID-19* (May 6, 2020), https://bit.ly/2Xz29qi ("The senators have urged the use of home confinement. . . to protect vulnerable inmates."); Letter from U.S. Sens. Elizabeth Warren, Edward J. Markey & Lori Trahan to Michael Carvajal, Dir., Fed. Bureau of Prisons (May 15, 2020), https://bit.ly/3erL2gG ("it is critical that the BOP depopulate prisons to the maximum extent safely possible").

Even DOJ and BOP understand that they are unable to care for the incarcerated population under these circumstances. Albeit belatedly and with questionable guidance, Attorney General Barr issued two memorandums to the BOP, directing BOP to increase the use of home confinement.    BOP similarly issued guidance to its officers, acknowledging that "it has become imperative to review at-risk inmates for home confinement."   *See* Mem. from Hon. William P. Barr, U.S. Atty. Gen. to Michael Carvajal, Dir., Fed. Bureau of Prisons 1 (Mar. 26, 2020), https://politi.co/3dblYL0; Mem. from Hon. William P. Barr, U.S. Atty. Gen. to Michael Carvajal, Dir., Fed. Bureau of Prisons (Apr. 3, 2020), https://bit.ly/3ciP5eV.   Unfortunately, BOP has remained unwilling and unable to effectively use this mechanism to depopulate.

As such, according to the BOP, as of September 15, 2020, the BOP had 126,653 federal inmates in BOP-managed institutions and 14,076 in community based facilities. There are 1,854 federal inmates and 636 BOP staff who have confirmed positive test results for COVID-19 nationwide. There have been at least 120 federal inmate deaths and 2 BOP staff members how have died in custody due to COVID-19. There also still remains a shortage of testing. BOP reports 53,683 inmates have had tests. See https://www.bop.gov/coronavirus. Importantly, the explosion of COVID-19 in BOP facilities throughout the country also places the communities where those facilities are located at greater risk. Thus, the balancing of safety concerns for the public also support a variance from the guidelines to a sentence of time-served.

**(5)    The Need to Avoid Unwarranted Disparities.**

Not all disparities in sentencing are prohibited – only *unwarranted* disparities.  *See* 18 U.S.C. § 3553(a)(6). Here, because there are no analogous guidelines, it is more difficult to

14

address sentencing disparities. Government counsel has accurately reflected the sentences imposed in the limited number of cases prosecuted under this statute. A sentence of time-served would be appropriate in this case in light of sentences imposed in these other cases and in light of the COVID—19 conditions. In this District, many judges have recognized that the harsher conditions imposed due to COVID warrant consideration, including Judge Bates in *United States v. Cox*, 19-CR-235; Judge Contreras in *United States v. William White*, 19-325, and most recently, Judge Amy Berman Jackson in *United States v. Michael Cowan*, 18-CR-208. In *Cowan*, Judge Jackson suggested time spent in custody during the virus should be credited more, maybe even double.   In light of these rulings, a sentence effectively two or three months less than what the government is recommending, would be well within the norm. Moreover, because Mr. Yeo will also inevitably spend at least some time in ICE custody, and potentially considerable time, a sentence of time-served is more than sufficient, and a sentence in excess of time served would be greater than necessary to meet the purposes of sentencing.

## Conclusion

For all of the foregoing reasons and such other reasons as may be presented at the sentencing hearing, Mr. Yeo respectfully moves this Honorable Court to impose a sentence of time served (the equivalent of an approximate 13 month sentence).

Respectfully submitted,

A. J. KRAMER
FEDERAL PUBLIC DEFENDER

/s/

_____
MICHELLE PETERSON
Chief Assistant Federal Public Defender
625 Indiana Avenue, N.W.
Suite 550
Washington, D.C.   20004
(202) 208-7500 ext. 109

16