```
                    UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA


  UNITED STATES OF AMERICA,      .
                                 .
            Plaintiff,           .  CR No. 20-0087 (TSC)
                                 .
      v.                         .
                                 .
  JUN WEI YEO,                   .  Washington, D.C.
                                 .  Friday, October 9, 2020
            Defendant.           .  11:15 a.m.
  . . . . . . . . . . . . . . . .
```

```
                 TRANSCRIPT OF SENTENCING HEARING
               BEFORE THE HONORABLE TANYA S. CHUTKAN
                   UNITED STATES DISTRICT JUDGE
```

APPEARANCES:

For the Government:            ERIK M. KENERSON, AUSA
                               THOMAS N. SAUNDERS, AUSA
                               U.S. Attorney's Office
                               555 Fourth Street NW
                               Washington, DC 20530
                               (202) 252-7566

For the Defendant:             MICHELLE M. PETERSON, AFPD
                               Federal Public Defender Office
                               625 Indiana Avenue NW
                               Suite 550
                               Washington, DC 20004
                               (202) 208-7500

Court Reporter:                BRYAN A. WAYNE, RPR, CRR
                               U.S. Courthouse, Room 4704-A
                               333 Constitution Avenue NW
                               Washington, DC 20001
                               (202) 354-3186

Proceedings reported by stenotype shorthand.
Transcript produced by computer-aided transcription.

P R O C E E D I N G S

1
2          THE DEPUTY CLERK:  Your Honor, we have criminal
3     action 20-87, United States of America versus Jun Wei Yeo.
4     We have Mr. Erik Kenerson and Mr. Thomas Saunders representing
5     the government.  We have Ms. Shellie Peterson representing the
6     defendant, all appearing by video, and we also have Ms. Crystal
7     Lustig from the probation office, also appearing by video.
8          THE COURT:  Good morning.
9     Mr. Yeo, can you hear me?
10          THE DEFENDANT:  Yes, Your Honor.
11          THE COURT:  Okay.  The most important person that
12    needs to be able to hear in this proceeding is you.  If at
13    any point you cannot hear, you should raise your hand.  Okay?
14          THE DEFENDANT:  Yes, Your Honor.
15          THE COURT:  Can everybody else hear me?
16          THE DEFENDANT:  Yes, Your Honor.
17          MS. PETERSON:  Yes, Your Honor.
18          THE COURT:  All right.  Mr. Kenerson and Mr. Saunders,
19    I might have some additional questions for you later on, but
20    nothing that you won't be able to handle.
21          So we're here for the sentencing of the defendant, Jun Wei
22    Yeo, who has pleaded guilty to acting as an illegal agent of a
23    foreign government in violation of Title 18 § 951 of the United
24    States Code.
25          In preparation for the sentencing, I've received and

reviewed the following materials: the presentence report and

the sentencing recommendation from the probation department, and

I've also received from counsel in advance of the hearing the

plea agreement signed by Mr. Yeo along with the Statement of

Offense, sentencing memoranda from the government and Mr. Yeo,

and the government's supplemental brief regarding its motion.

Now, is there anything else -- is there something I'm

missing?

MS. PETERSON:  No, Your Honor.

THE COURT:  Who will be speaking for the government,

Mr. Saunders or Mr. Kenerson?

MR. KENERSON:  I will, Your Honor.  That's Erik

Kenerson.

THE COURT:  All right.  Mr. Yeo, you may recall at

your plea hearing, we proceeded in three steps.  The sentencing

is similarly going to proceed in a series of steps.

The first step is for me to determine whether you've

received the presentence report and discussed it with your

lawyer and if there are any remaining objections.

The second step is the sentencing guidelines and sentencing

range, if any, apply to your case.

The third step is to hear from the government, from your

lawyer, and from you if you wish to be heard about sentencing

in this case.

And the last step is mine.  It requires me to fashion a

1    just and fair sentence in light of all the factors set forth in

2    the statute at 18 U.S.C. § 3553(a).

3         So let me first begin with the presentence report which was

4    filed on September 29, 2020.  Mr. Kenerson, does the government

5    have any objections to any of the factual determinations set

6    forth in the presentence report?

7              MR. KENERSON:  We do not, Your Honor.

8              THE COURT:  Okay.  Are you expecting an evidentiary

9    hearing?  Do you have any witnesses who want to speak?

10             MR. KENERSON:  We do not expect an evidentiary

11   hearing, no.

12             THE COURT:  Okay.  Mr. Yeo, are you fully satisfied

13   with the services of Ms. Peterson as your lawyer in this case?

14             THE DEFENDANT:  Yes.  I am fully satisfied with the

15   services of Ms. Peterson as my lawyer in this case.

16             THE COURT:  Okay.  And do you feel that you've had

17   enough time to talk to her about the probation department's

18   presentence report, recommendation, and all of the papers that

19   have been filed in this case?

20             THE DEFENDANT:  Yes, Your Honor.  I feel that I've

21   had sufficient time to discuss the presentence report as well

22   as all the following information, and I'm very satisfied with

23   Ms. Peterson's services.

24             THE COURT:  All right.

25        Ms. Peterson, have you and Mr. Yeo read and discussed the

1    presentence report?

2            MS. PETERSON:  We have, Your Honor.

3            THE COURT:  Are there any disputed issues of fact?

4    That is, does Mr. Yeo have any objection to any of the factual

5    statements set forth in the presentence report?

6            MS. PETERSON:  No, Your Honor.

7            THE COURT:  All right.  Hearing no objection and

8    seeing none in the report, I will accept the factual recitation

9    in the presentence report regarding the circumstances of the

10   offense, and therefore the facts as stated in the presentence

11   report will be my findings of fact for purposes of this

12   sentencing.

13       Okay.  Moving on to the second step, Mr. Yeo, the probation

14   office and the parties agree that there are no sentencing

15   guidelines directly applicable to the offense of conviction, nor

16   are there any closely analogous guidelines that could be used to

17   determine an offense level.  I agree and find that there is not

18   a sufficiently analogous guideline, and therefore provisions of

19   18 U.S.C. § 3553 shall control.

20       Having concluded that no guidelines apply, I will now

21   consider the government's pending motion for a downward

22   departure.  The government submits that an appropriate sentence,

23   having considered all the facts in this case, would be a

24   sentence of 16 months of incarceration.

25       Obviously, I assume you have no objection to the

1    government's motion, Ms. Peterson?

2                MS. PETERSON:  No, Your Honor.  We do not object

3    to the government's motion for a downward departure.

4                THE COURT:  All right.  Having reviewed the

5    government's motion, I will grant the government's motion for

6    a downward departure.

7           All right.  Section 3553 requires me to consider a variety

8    of factors including the applicable penal statutes.  So I'm

9    going to take this moment to describe generally the statutory

10   penalties for this offense.

11          The charge of acting in the United States as an illegal

12   agent of a foreign government, in violation of 18 U.S.C. § 951,

13   carries a statutory maximum penalty of 10 years' imprisonment.

14          If a term of imprisonment is imposed, the statutes provide

15   that Mr. Yeo faces a supervised release range following

16   imprisonment of at least one year but no more than three years,

17   and a probation period between one and five years.

18          The statute of conviction sets a maximum fine of up to

19   $250,000.  Special assessment of $100 per count is mandatory,

20   and the statutory restitution provision is inapplicable because

21   there is no identified victim.

22          Counsel, have I stated accurately the statutory framework

23   under which we're operating?  Mr. Kenerson?

24                MR. KENERSON:  Yes, Your Honor.

25                THE COURT:  Ms. Peterson.

1            MS. PETERSON:  Yes, Your Honor.

2            THE COURT:  All right.  Before I discuss the other

3   sentencing factors that I have to take into account, I'd like to

4   note that the probation office has recommended a term of 18

5   months' incarceration with no period of probation or supervised

6   release, taking into account the available sentences, similar

7   sentences for similar conduct, and all of the factors set forth

8   in § 3553.  The recommendation of the probation office is not

9   based on any facts and circumstances that have not already been

10  revealed to the parties in the presentence report.

11       So I will note also that Ms. Peterson has asked this court

12  to sentence Mr. Yeo to a period of time served.

13       Ms. Peterson, I do have a question for you.  So Mr. Yeo has

14  been detained almost a year, since November 2019.  Right?

15            MS. PETERSON:  That is correct.

16            THE COURT:  And if I were -- obviously, I know the

17  effect of giving a time-served sentence.  With institutional

18  good-time credit, a term of a year or more -- well, a term of

19  16 months would result in his release and deportation in

20  approximately, I'm thinking --

21            MS. PETERSON:  Your Honor, I believe that the

22  government has actually gotten -- if their recommendation

23  were to be adopted by the Court, the estimate would be a

24  release date at the end of December.

25            THE COURT:  Okay.

1          MS. PETERSON:  If the Court were to sentence Mr. Yeo

2     to a time of approximately 13 months, he would have already

3     served that sentence.  So 13 months would be the equivalent of

4     the time-served sentence, and a sentence of 16 months would be

5     roughly the end of December.

6          THE COURT:  And, Ms. Lustig from Probation, with the

7     16 or 18 month sentence, where would Mr. Yeo actually be housed

8     given that we're talking about a relatively short period of

9     incarceration?

10          PROBATION OFFICER:  I can't be certain, Your Honor.

11     I don't know whether the BOP, the marshals, would move him into

12     BOP custody with such a short sentence.  He may just remain

13     incarcerated in the current facility.

14          THE COURT:  Because -- and I'm not hiding the ball

15     here.  My concern here is we are in the middle of a pandemic.

16     Believe it or not, the jail's numbers in terms of COVID are

17     better currently I believe -- and, Ms. Peterson, you can correct

18     me, or Mr. Kenerson, you can correct me if I'm wrong -- better

19     than most of the Federal Bureau of Prisons institutions.

20          Am I wrong?

21          MS. PETERSON:  You are not wrong.

22          THE COURT:  I mean I get the jail numbers every day.

23          MS. PETERSON:  Correct.

24          PROBATION OFFICER:  Your Honor, you could recommend

25     that he remain at the D.C. jail for service of any remaining

1    sentence.  So, normally, you would recommend a BOP institution.

2    You can recommend that he be designated to the D.C. jail to

3    continue out the sentence.

4            THE COURT:  All right.  Well, I guess I'll ask

5    Ms. Peterson about that at her allocution.  Thank you.

6        All right.  At this point I'd like it give the parties an

7    opportunity to present their positions to the Court.

8        Mr. Kenerson?

9            MR. KENERSON:  Thank you, Your Honor.  I think before

10   I get into my allocution, just to follow up on what the Court

11   was just talking about, our understanding, though it's no

12   guarantee from talking to some folks at BOP, is that if the

13   Court were to sentence him to 16 months, he likely would be

14   designated somewhere but, because of delays in transport due

15   to COVID, would likely not actually be transported there.  So he

16   likely would stay at the D.C. jail to the end of his sentence,

17   but that would not be a guarantee absent some intervention.

18           THE COURT:  And notwithstanding those factors, is

19   it still your recommendation that a sentence of 16 months is

20   appropriate in this case?

21           MR. KENERSON:  It is our recommendation.  I think if

22   the Court were to sentence him to 16 months, Ms. Peterson may

23   have a request that may facilitate his staying at the jail as

24   well, which I would like to let her make; and we would like to

25   defer to the Court on the request we're thinking of, but that is

1    still our recommendation.

2              THE COURT:  All right.  Continue, please.

3              MR. KENERSON:  Thank you.  So after having read

4    through both the parties' submissions in this case, it's clear,

5    and I don't think it seems disputed, that Mr. Yeo is smart; he's

6    talented; he's driven.

7         But also, when his academic path became difficult, he

8    willingly took on a role of the Chinese intelligence services

9    that jeopardized U.S. national security.  His work with the

10   Chinese intelligence services took advantage of the openness of

11   U.S. social media platforms and the naivety of people in the

12   U.S. who were searching for new work opportunities for

13   themselves.

14        Just to give a couple of examples, at the direction of

15   Chinese intelligence operatives, the defendant created a fake

16   consulting company that shared its name with a prominent U.S.

17   consulting company.  Though his company was ostensibly based in

18   Singapore, 90 percent of the applications he received were from

19   people residing in the United States.  And when they erroneously

20   submitted resumes to this Singaporean company, Yeo forwarded

21   those of interest to his Chinese intelligence contacts, giving

22   them a look at potential targets for recruitment.

23        The defendant also used a prominent career-focused social

24   networking site to target U.S. citizens on behalf of Chinese

25   intelligence.  The website's algorithm eventually learned the

1    type of target Mr. Yeo was interested in, suggesting more

2    potential contacts with increasing accuracy.  He repeatedly

3    used that platform's message to get to know targets who were

4    themselves largely only looking to further their careers.

5         Notably, he received and followed instructions from his

6    Chinese intelligence handlers for how to recruit potential

7    targets including asking whether those targets had financial

8    difficulties, disaffection with work, and whether they had

9    family issues that would make them more susceptible to Mr. Yeo's

10   recruitment efforts.

11        In other words, the defendant spotted and assessed

12   vulnerable U.S. citizens who had access to information that

13   Chinese intelligence deemed valuable.  He did so at the

14   direction and control of Chinese intelligence officials, and

15   in the process, he took advantage of those vulnerabilities to

16   the detriment of U.S. national security and for the benefit of

17   China.

18        Mr. Yeo often withheld information from his targets,

19   telling that they were working for Chinese consulting clients

20   rather than the government.  He built rapport with them,

21   listening to the very stories that made them vulnerable to his

22   recruitment, and then he paid them for their information.

23        The defendant's lack of transparency with the U.S. targets,

24   however, was not symmetrical.  He knew he was working for

25   Chinese intelligence as he took the steps that he did.  His

handlers provided instructions on intelligence tradecraft,
such as whether and how to communicate with them when he was
in the United States, and they instructed him once they thought
he had access to solicit classified information.

Sure enough, in November 2019, just before the defendant
was arrested, he came to the U.S. with the intent to solicit
U.S. Person 2, who had previously worked at the Pentagon, for
classified information.  That plan was disrupted by his arrest,
but was nonetheless his plan, as he admitted under oath before
Your Honor at the plea hearing.

We point this out for the Court to underscore the
seriousness of the defendant's conduct.  He was neither charged
with, nor did he plead guilty to, espionage.  We don't know if
he would have succeeded in his plan, and we're not asking the
Court to apply the espionage guidelines here.

But the seriousness of the defendant's conduct, what he
was seeking to do, is underscored by the sentence prescribed by
Congress for that offense and underscored by the sentencing
guidelines for that offense.  And in November 2019, that was
the offense that Mr. Yeo was intending to commit when he came
to the United States.

And much of Mr. Yeo's work to that point, which underlies
his guilty plea, was the necessary groundwork that he had to lay
before he would have had access to any classified information,
and he accepted a mission that involved seeking it at his first

1    opportunity.

2         Yeo's offense is serious for the other reasons laid out

3    in the government's memorandum as well.  He sought information

4    about the F-35 fighter jet program, about the withdrawal of the

5    U.S. troops from Afghanistan, and nonpublic information about a

6    cabinet member.  His scheme was ongoing over a matter of years.

7    This was not a one-off lapse in judgment that we're talking

8    about here.

9         The seriousness of the defendant's conduct does need

10   to be balanced, however, against his early acceptance of

11   responsibility and his substantial assistance to the

12   United States as laid out in the government's supplemental

13   sentencing memorandum.

14        We do not agree with the defense that the pandemic alone

15   is a reason to reduce the defendant's sentence, but we certainly

16   agree that the defendant took responsibility for his conduct

17   early and that he cooperated with law enforcement.  He should

18   be given credit by the Court for pleading guilty at the earliest

19   possible opportunity.

20        He should also receive substantial credit for the

21   assistance he provided the United States which is laid out in

22   the government's supplemental memorandum.  The information he

23   provided included valuable intelligence in further criminal

24   investigations.

25        I know the Court said you had some questions.  We'd be

1    happy to answer them.  If there's anything about the defendant's

2    cooperation, we'd be happy to answer them in the equivalent of a

3    sealed proceeding, like whatever the equivalent of a bench

4    conference is, but we also believe that the memorandum stands

5    on its own in justifying the government's request for a departure.

6           THE COURT:  Yes.  Go ahead.

7           MR. KENERSON:  In short, the defendant's crime was a

8    serious one that put the national security of the United States

9    at risk.  He worked for a hostile foreign power on our soil,

10   collected nonpublic information of interest to that power, and

11   he exploited individual vulnerabilities of U.S. citizens along

12   the way.  When he came here November 9, 2019, he was seeking

13   classified information.

14      But given the seriousness of his crime, he did everything

15   he could to assist the United States on the back end, providing

16   credible information to both law enforcement and intelligence

17   value.  Balancing all of that information, the government

18   believes that 30 months' incarceration would be an appropriate

19   sentence in this case, but because of the defendant's

20   cooperation, we ask to reduce that to a term of incarceration

21   of 16 months.

22          THE COURT:  Okay.

23          MR. KENERSON:  So unless the Court has any questions

24   -- I know you said you had some at the beginning -- we'd be

25   happy to answer any of them now.  But, otherwise, we would turn

1    it over to Ms. Peterson.

2             THE COURT:  All right.  I do have a couple of

3    questions.  You lead -- in your nonexclusive examples, you lead

4    with the Butina case, which was before me and which you and

5    Mr. Saunders prosecuted.  So, naturally, I have some questions

6    there, because in that case you proffered that the crime

7    warranted 24 months, and taking into account her cooperation,

8    then asked for 18 months, which I imposed.

9        It's sort of a similar situation here except for a couple

10   of things, I think, which will weigh in favor of Mr. Yeo and

11   against him.  Against him, it appears that he was far more

12   successful in his endeavors and his efforts lasted longer.

13   Would you disagree with that or agree with that?

14            MR. KENERSON:  I would agree with that.

15            THE COURT:  Okay.  In his favor, it appears that his

16   -- I mean from what I've read, Mr. Yeo actually got on the

17   plane.  He was questioned a second time at the airport.  He was

18   questioned when he got to the U.S.  He decided to leave the U.S.

19   I think the next day, was questioned before he got on the plane,

20   got on the plane, and then got off the plane and agreed to

21   answer the questions.  Is that right?

22            MR. KENERSON:  Something very similar to that.

23   I'm not sure if he actually made it onto the plane.

24            THE COURT:  Okay.

25            MR. KENERSON:  But, yes, he had initially declined

1    to speak with people at the gate and later changed his mind and

2    said yes.

3              THE COURT:  Okay.  So he did not complete -- he may

4    not have completed the embarkation process.  So what I'm getting

5    at is that it appears that his desire was to come clean, or at

6    least to answer questions very early on, before he was actually

7    even formally charged or a deal could be worked out.

8         Is that right?

9              MR. KENERSON:  That is correct.

10             THE COURT:  Let me ask you, does it appear that the

11   information that he provided at that early date was truthful?

12             MR. KENERSON:  In some parts yes, in some parts

13   no.  In some parts, he denied initially of working for Chinese

14   intelligence operatives, but still it was -- and that was at

15   the very initial interviews, but it was very soon thereafter

16   that he came clean on that front.  And since that point, he has

17   been most truthful.

18             THE COURT:  Did he do that even before he was

19   appointed counsel?

20             MR. KENERSON:  He did do that even before being

21   appointed counsel.  Yes.

22             THE COURT:  Okay.  And seeing as you and Mr. Saunders

23   prosecuted both cases, I'm going to take it that your knowledge

24   of the level of cooperation in both cases as well, as of the

25   level of damage inflicted by both these individuals, informs

1    your request for the 16 months.  Is that correct?

2            MR. KENERSON:  It does, Your Honor.  And I think the

3    Court had noted, in terms of things to weigh against Mr. Yeo,

4    that he was more successful in that his campaign took advantage

5    over longer.  One other thing I would note, as I said in my

6    allocution just before this, was that he got -- at least on its

7    face, we don't, again, know whether he would succeed, but he was

8    at the point of seeking classified information, which is not

9    something we were ever able to establish in the Butina case,

10   which informed in part our saying that 30 months without

11   cooperation would be higher than 24.

12           The flip side as well, in addition to what the Court's

13   pointed out and without getting into the details, we found

14   Mr. Yeo's cooperation to be of higher value to the government.

15   So that's why we asked for more credit for him.

16           THE COURT:  I appreciate that, and I appreciate the

17   points you just made.  The comparator case and this case weighs

18   heavily with me because both of you prosecuted that case and

19   are in a position to compare them.  So I appreciate those

20   clarifications.

21           All right.  Ms. Peterson.

22           MS. PETERSON:  Yes, Your Honor.  I think Mr. Yeo,

23   first of all, wanted me to again express that he very much

24   appreciates the government's recommendation and their

25   willingness to work with him.

1      I think the Court has hit on what we think is the most
2  important factor, which is that Mr. Yeo, while he was still
3  free to leave the United States, he agreed to cooperate with the
4  United States, and within hours was completely truthful with the
5  government about what was going on, turned over his electronics,
6  turned over other materials he had in his possession that the
7  government could use.
8      I am not, obviously, in a position to compare his
9  cooperation to that in another case like the government is, but
10  we would not quibble with the government's characterizations of
11  the value of this cooperation.  We would simply note how early
12  on it came in this case.
13      I also would like -- I think from my perspective, the
14  only difference between what we're recommending and what the
15  government's recommending is because of where he's been
16  incarcerated and how he's been incarcerated.
17      Unlike Ms. Butina, who was not incarcerated during the
18  COVID situation, Mr. Yeo has been under pretrial detention this
19  entire year and, for almost half of that time, has been under
20  the very harsh pretrial conditions that are a result of the
21  COVID situation.
22          THE COURT:  Ms. Peterson, let me interrupt you for a
23  minute.  If I were to impose a period of incarceration beyond
24  time served -- say, for example -- and I'm not saying this is
25  what I'm going to do, but say I agree to the government's

recommendation and gave him a period of 16 months.  What would

you be requesting regarding his designation or my recommendation?

MS. PETERSON:  Your Honor, I think because of the

concerns we have with respect to transporting him to another

facility and the likelihood that that could cause him to

contract COVID, we would be asking him to remain at CTF.  I have

no belief that any of us has any knowledge of what BOP would do.

It is true that for some time BOP and the Marshals Service

were not moving people expeditiously, and I had people who had

been sentenced to stay at the D.C. jail for months on end.  Now,

however, I just had someone who was sentenced who was gone in

two weeks.  So I don't think we can rely upon that representation.

So, frankly, if the Court were to indicate that it intended

to impose a sentence of 16 months, and I will come back to why I

believe the Court should not do that, but if the Court were to

do that, I would ask the Court -- and this is what Mr. Kenerson

was referring to -- to actually delay imposition of the

sentencing until closer to the end of that sentence and to have

us back in court to announce what the sentence was going to be

today, but to delay any imposition of that until a time closer

to when his release date is anticipated to be.

THE COURT:  All right.

MS. PETERSON:  What I would like to point out, and

I've said this in the sentencing memorandum, so I'm not going to

belabor it --

1          THE COURT:  Well, let me ask you, Ms. Peterson, what

2     about Ms. Lustig's position that I could impose sentence and

3     recommend that he be kept at CTF?  Obviously, it's a

4     recommendation.

5          MS. PETERSON:  Right.  That would also be an option,

6     but I think because it is just a recommendation, we don't have

7     any guarantee that the BOP will honor that, and I don't know how

8     it is impacted on marshals' decisions about moving people.

9          THE COURT:  Okay.

10          MS. PETERSON:  And so I think my way would be more

11     likely to actually guarantee that he not be moved.  But if the

12     Court is not inclined to do that, then I think Ms. Lustig's is

13     the second best alternative.

14          I would like to go back, however, to why I think that a

15     sentence of time served or a sentence of 14 months would be more

16     appropriate than a sentence of 16 months.  And primarily that is

17     because, just as I've already alluded to, of the conditions that

18     he's been held under, which I think differentiates this case

19     from Butina in the manner that it's not reflected by either

20     the government's recommendation or the probation office's

21     recommendation, because he has spent it during the time of

22     COVID.

23          And I would note that Judge Amy Berman Jackson just --

24     I believe it was a couple of weeks ago -- indicated that in her

25     view, time served at the D.C. jail under COVID conditions was

1    entitled to considerably more weight than not, and she said

2    maybe even twice as much credit.  We're certainly not asking --

3              THE COURT:  She's getting quoted a lot --

4              MS. PETERSON:  I am sure she is.

5              THE COURT:  -- in your office.

6              MS. PETERSON:  I can assure the Court that that was

7    a transcript that we did request on an expedited basis.

8        I would also, however, note that perhaps even more

9    important than that, if Mr. Yeo were not deportable, he would be

10   eligible immediately -- even with the government's recommendation,

11   he would be eligible immediately for placement on home

12   confinement or a halfway house because he's got less than six

13   months to serve.  He would, with the government's request, have

14   only two months to serve, and he's not eligible for that.

15             THE COURT:  Do I need to sign a removal order?

16   Because I don't have one.

17             MS. PETERSON:  I will defer to the government on that.

18             THE COURT:  Okay.  Well, we'll get back to that.  Go

19   ahead, Ms. Peterson.

20             MS. PETERSON:  But we are trying to work with the

21   government.  Mr. Yeo has no desire to stay in this country.

22   He's not hoping to be released accidentally into the community

23   and stay here.  He wants nothing more than to go home to

24   Singapore to his family and, as he has put it and as said in my

25   sentencing memorandum, to lead a simple life.  He understands he

1    has lost a lot.

2        This is a huge punishment for him.  He's lost his ability

3    to complete his Ph.D.  I don't know if the Court is aware, but

4    this case has received a great deal of notoriety in his home

5    country.  His family has suffered from that, and he will

6    continue to suffer the consequences of that.  But he wants

7    nothing more than to return home to Singapore.

8        So we would request that he hopefully does not languish

9    in immigration custody, but also does not inadvertently get

10   released into the United States.  He wants to go home.  So we're

11   working with that process, and that process I believe will be

12   considerably easier if he remains here at CTF where we can

13   hopefully manage the situation in a better way.

14       I will note that I have another client who was sentenced

15   by Judge Sullivan.  Her sentence was reduced to time served.

16   That was more than six months ago, and she is still sitting in a

17   local facility contracted by ICE, unable to be deported, and no

18   one can answer a simple inquiry as to why ICE is still keeping

19   her here.  She has her own theories, that it is because the

20   institution is not cooperating because they're getting paid for

21   her to remain there, but we cannot ascertain why this has taken

22   so long for her removal to occur.

23       I worry that the same could happen to Mr. Yeo, and I

24   want nothing more than to do everything we can in our power

25   to make sure that he gets removed from this country as

1   expeditiously as possible.  But, as I said, if he were not

2   deportable, he would be eligible for halfway house or home

3   confinement immediately even if the Court were to impose the

4   greater sentence.

5        So I think for all of those reasons, while we agree

6   completely with what the government has proffered, and Mr. Yeo

7   takes no issue with the seriousness of his offense, we believe

8   a sentence of 13 months or 14 months or time served would be

9   appropriate in this case.

10            THE COURT:  All right.  Thank you, Ms. Peterson.

11       Mr. Yeo, is there anything you'd like to say?  Mr. Yeo?

12            THE DEFENDANT:  Yes, Your Honor.

13       I'd just like to say that I take full responsibility for my

14   actions.  I want to apologize to my American friends, especially

15   those whom I obtained reports from.  It was not my intention to

16   harm them or their families.

17       I am sympathetic to China's position, but it was not

18   my intention to harm anyone.  But once again, I take full

19   responsibilities for what I've done, and especially, as

20   Ms. Peterson said, all I'd like to do is go home to my family

21   and... that's all I want to say.

22            THE COURT:  All right.  You sure?  I mean you can take

23   a minute and compose yourself if you want to speak further.

24            THE DEFENDANT:  I just want -- in addition, I'd like

25   to thank the U.S. federal government, especially the FBI, for

1    showing me a great deal of professionalism and leniency as well

2    as being supportive, and I've been shown nothing but

3    professionalism and courtesy ever since I stepped foot into the

4    U.S.  And that's not because I want a lenient sentence.  That's

5    the absolute truth.  But having said that, I still have to state

6    that I am still sympathetic to the Chinese cause.  But that's

7    really all I wanted to say.

8             THE COURT:  Well, Mr. Yeo, you say you're sympathetic

9    to the Chinese cause.  What do you mean by that?  What is their

10   cause?

11            THE DEFENDANT:  I think there is a general feeling in

12   China that the U.S. is out to sort of mute China enterprise or

13   try to reverse.  And politically I do have those sympathies, and

14   I admit that freely.  But I do admit that what I've done is

15   harmful to the United States.  It wasn't my intention to cause

16   harm.  So -- yeah.

17            THE COURT:  Well, Mr. Yeo, I have to say -- and, you

18   know, your feelings are your feelings, and I'm not going to

19   punish you for them.  I'm going to punish you for what you did,

20   not for what you think.  And I'd like to point out that -- and

21   that goes along with the professional and compassionate

22   treatment that you received from the government and the FBI in

23   this case, that despite your actions in attempting to subvert

24   the laws of the United States and get information and get

25   individuals, including U.S. citizens who are employed by the

1    military or retired, to act against the interest of the

2    United States, despite your actions in seeking to undermine the

3    laws of this country and to gain information that China could

4    use to its advantage, you are not being punished for your

5    thoughts or for your political beliefs.  And you have been

6    treated with what I believe to be a sense of professionalism

7    and courtesy.

8        I don't know that an American who did what you did in

9    another country would be -- or in China would be treated that

10   way.  I don't know.  But I'm simply pointing out that, despite

11   your beliefs about America's intentions or political

12   motivations, I have no opinion on that issue.  That's politics

13   and international affairs.  I'm not speaking to that.

14       I would note that you have been treated in a way that is

15   the best of our system.  It's not a perfect system by any means.

16   But I think in this case justice has been done and you have been

17   afforded the full panoply of rights and due process that you're

18   entitled to, including the very excellent services of one of our

19   best lawyers, Shellie Peterson.

20       So I hope you bear that in mind.

21           THE DEFENDANT:  Yes, I do, Your Honor.

22           THE COURT:  I think it bears pointing out.

23       Okay.  Ms. Peterson, is that it?  Do you have anything else

24   you wish to proffer?

25           MS. PETERSON:  No, Your Honor.  The only thing I would

point out, and I can do this based on the involved debriefings
that we had in the sessions with the government, I think it's
important to point out that when he talks about his continued
support of China, he's not talking about sort of what's in the
politics of today.  He's talking about the economic policies in
China and China's ability to uplift people from poverty into an
ability to succeed on their own, which really is the economic
policies he's referring to.

THE COURT:  I understand.  Thank you.

All right.  After hearing the statements made by counsel
and Mr. Yeo, I'll now consider the relevant factors set out by
Congress in 18 U.S.C. § 3553(a) and ensure that I impose a
sentence sufficient but not greater than necessary to comply
with the purposes of sentencing.

These purposes include the need for the sentence imposed
to reflect the seriousness of the offense, to promote respect
for the law, and to provide just punishment for the offense.
The sentence should also deter criminal conduct, protect the
public from future crimes from the defendant, and to promote
rehabilitation.

In doing so, I must consider the nature and circumstances
of the offense, the history and characteristics of the
defendant, the types of sentences available, and the need to
avoid unwarranted sentence disparities among similar defendants
found guilty of similar conduct.  I have considered all of these

factors when deciding what the appropriate sentence is in this case, and I'll discuss it now.

And I'll tell you that this case has caused me a lot -- I've thought a lot about this case.  I've lost some sleep about this case; and it's not an easy decision, but it's a decision that I have to make.

With regard to the nature of the offense, the nature of the offense is very serious here.  Just because Mr. Yeo wasn't charged under the Espionage Act, which obviously is a much more serious offense, and the statute under which he was charged reflects the government's determination as to the seriousness of his conduct, it can't be ignored.

And I don't want to diminish the fact that Mr. Yeo worked under the direction and control of intelligence service operations from the People's Republic of China, trying to obtain valuable nonpublic information from the United States and using the internet and various social media sites he worked to spot and assess Americans with access to valuable nonpublic information including U.S. military and government employees with high-level security clearances.

He recruited these individuals, several of whom were struggling financially, and paid them to write reports.  By the time of his arrest, he provided Chinese intelligence officials with reports on a U.S. military aircraft program, the withdrawal the U.S. troops from Afghanistan, and information from a member

1    of the cabinet of the United States.

2         The crime Mr. Yeo committed was not a result of a momentary

3    lapse in judgment.  Rather, Mr. Yeo, you relayed information of

4    the United States to the Chinese government over a period of

5    four to five years and orchestrated an elaborate scheme to do

6    so, created a fake consulting company; and at the direction of

7    the Chinese government, targeted individuals who were worried

8    and vulnerable because of their financial situation.  Your

9    conduct was sophisticated and successful, likely because you

10   never revealed yourself to be an agent of a foreign government.

11        Mr. Yeo, you are -- I can tell, even without the

12   government's materials and the presentence report, I can tell

13   that you're a highly educated man, and I have no doubt that you

14   understood what you were doing.  Your operation was designed to

15   weaken the United States to the benefit of China, and you were

16   not afraid to take advantage of vulnerable public servants to do

17   just that.

18        However, I do note, and I asked the government about this,

19   that the second time I think it was, the second time you were

20   questioned about your activities, you decided to come clean.

21   You did not take the avenue of escape that you may have been

22   afforded.  You changed your mind and decided to speak with the

23   agents, and shortly thereafter, without the benefit of counsel,

24   confessed.  And I take that into consideration here.

25        I also take into consideration that ever since that time

1    you have done everything, and the government maintains you have

2    done everything, to try and make good and make up for your

3    actions.  And I view that very -- I note that, and it is

4    important, and I factor that into my sentence.  Because it's one

5    thing to do something wrong, but it's another thing to try to

6    make it right, and I always view mitigation efforts at trying

7    to undo the damage, I view them as important.

8        Turning to your characteristics as an offender, you have

9    no prior convictions, Mr. Yeo.  You were reared in an intact

10   family in Singapore.  You have come from humble origins.  And

11   though you report a meager upbringing, you were provided with

12   material necessities and were clearly in a position to achieve

13   higher education.  And I understand those efforts were

14   frustrated and in some part led to your participation in this

15   law-breaking.  You are single and you don't have any children,

16   and, again, as I've noted, you have cooperated to the extent

17   that the government has sought a downward departure.

18       Turning to the types of sentences available, the crime to

19   which you have pleaded guilty carries a maximum of 10 years'

20   imprisonment.  You have been in prison since November of 2019,

21   and thus your counsel has asked that I sentence you to time

22   served.  The government, after moving for a downward departure,

23   asks for a sentence of 16 months' incarceration, which means the

24   time you've already served, you'll serve an additional, I don't

25   know, four or five months.

1      In addition to the nature and circumstances of the offense

2  and history and characteristics of the offender which I've

3  already talked about, I have to consider the need to avoid

4  unwarranted sentence disparity.  And because there's not an

5  especially analogous sentencing guideline in this case, I was

6  unable to find statistics for median and mean sentences.

7      The government has identified several cases in which

8  various individuals charged with § 951 offenses were sentenced

9  to periods of incarceration lasting anywhere between 18 to 38

10  months.  One of those I am very familiar with because I

11  sentenced Ms. Butina in that case to 18 months' incarceration

12  for a similar crime.  In that case the government had requested

13  18 months, and I agreed with their recommendation.

14      As I've already said, there are some similarities and some

15  differences, both weighing in favor and against Mr. Yeo between

16  the two cases.  But I agree also with Ms. Peterson and with

17  Judge Jackson that we are not in normal times and that Mr. Yeo

18  has been fortunate that thus far in his incarceration he has not

19  contracted COVID.

20      This is not -- that's nothing the Court wants to happen to

21  any inmate, but it would be particularly -- you know, looking at

22  such a short sentence, it would be really awful if he were to

23  contract it because he had spent an extra few months in the jail.

24      But as with the Butina case, I rely heavily on the

25  prosecution's representations in this case probably more than

I do in other cases, simply because they're in a position to
I think credibly assess -- and I've dealt with Mr. Kenerson and
Mr. Saunders before, and I credit their professionalism in this
case and the agents they've worked with.  I do think they are
in the best position to assess both the significance of the
defendant's actions and the damages that were caused by the
defendant's actions as well as the value of the defendant's
cooperation.

I think their sentencing memorandum and recommendation
is reasonable.  I asked them if it has factored in the current
pandemic.  Even though, I have to say, that I've found the
government to be a little cavalier in other cases with regard
to the seriousness of the threat of COVID when it comes to
sentencing, I don't think that's the case here.

So my position is -- I'll be frank.  I don't want Mr. Yeo
to languish and be infected, but this is a serious case, and
it could have had serious repercussions.  It probably has had
serious repercussions, and I don't want to indicate by my
sentence that I think it's minor.  I don't think it's minor.
There's not a huge amount of daylight between what the
government's asking for and what Ms. Peterson is asking for.
I note also that Probation was recommending 18 months.

But I think that a fair and just sentence, in my
estimation, lies somewhere in the middle, and I'm going to take
Ms. Peterson's suggestion that I announce what my sentence will

1    be but continue this for actual imposition of sentence closer to

2    when his release date would be.

3         So it is my intention to sentence Mr. Jun Wei Yeo to a term

4    of 14 months on Count One.  He has already been incarcerated for

5    11 months, which will be credited towards his sentence.  He is

6    further -- I intend to further order him to pay a $100 special

7    assessment, and there will be no period of supervised release or

8    probation imposed.  But I ask the parties propose to me another

9    date for us to come in for actual imposition of sentence.

10        MS. PETERSON:  Your Honor, I think that with a

11   sentence of 14 months, we're probably okay with the Court

12   imposing it.  My proposal was based upon --

13        THE COURT:  On sixteen.

14        MS. PETERSON:  Right, if the Court were to do sixteen.

15   I think with 14, there's virtually no way --

16        THE COURT:  Okay.  Then I will impose sentence.

17        Mr. Kenerson, Mr. Saunders, let me be frank with you.

18   I would have been inclined to give the 16 months were we not in

19   the situation we are with the pandemic.  It is not -- the cases

20   are not dropping.  They are, in fact, rising.  And I'm very

21   concerned that having avoided being infected for the last year,

22   I just think it is in no one's interest to have this man stay in

23   the D.C. Department of Corrections for another four months or so

24   and risk a very, very serious disease.

25        And that's frankly why -- I would have given him the 16

months, but given the situation in which we find ourselves with
regard to the pandemic, I just don't think it's worth the risk.
And so I think your position was reasonable, and I think it was
a reasonable and fair sentence.  But given where we are with
COVID, I am going to reduce it to the 14 months.  So let me
impose sentence.

It is the judgment of the Court that you, Jun Wei Yeo, are
hereby committed to the custody of the Bureau of Prisons for a
term of 14 months on Count One.  You are ordered to pay a $100
special assessment.  The Court finds you do not have the ability
to pay a fine and therefore waives imposition of a fine in this
case.

The Court will not impose a period of supervised release
or probation in this case given that Mr. Yeo has consented to
removal from the United States, and therefore it is the
understanding of this court that he will be removed from the
United States immediately upon completion of his sentence, or
be held pending removal from the United States, but that he will
not be released into the United States.

The special assessment is immediately payable to the Clerk
of the Court for the U.S. District Court of the District of
Columbia.  Within 30 days of any change of address, you shall
notify the Clerk of Court of the change until such time
as the financial obligation is paid in full.

Mr. Yeo, pursuant to 18 U.S.C. § 3742, which I told you

about at the time of your plea, you have a right to appeal the

sentence imposed by this court subject to certain rights of

appeal you waived as part of your plea agreement in this case.

If you choose to appeal, you must file an appeal within 14 days

after I enter judgment.  If you're unable to afford the cost of

an appeal, you may request permission from the court to file an

appeal without cost to you.

As I mentioned earlier, in the plea agreement at page 7,

the parties agree to a stipulated order of removal.  That hasn't

been filed on the docket.  How do the parties intend to proceed

with regard to an order of removal?

MR. KENERSON:  Your Honor, we've been -- the

government, in discussions with Ms. Peterson and in consultation

with ICE, we believe that there is a separate way that would get

him home at least as fast and possibly faster as a judicial

removal order.  So with the defendant's agreement, we are going

to pursue that route.

THE COURT:  Okay.

MR. KENERSON:  Which does not lie with this court.

THE COURT:  Okay.

MR. KENERSON:  One thing we will be asking for and we

intend to file a motion shortly thereafter, which I don't expect

having opposition to after having talked to Ms. Peterson, is an

order that this court issue an order to the Department of

Corrections to notify ICE at least 24 hours prior to defendant's

1    expected release time, and also that they release him into ICE

2    custody because there's --

3                THE COURT:  Okay.  That's fine.  Go ahead and file

4    that.  Ms. Peterson, you agree to that?

5                MS. PETERSON:  Yes, Your Honor.  I think the

6    government will put a time limitation on when ICE has to come

7    to get him so he's not stuck at the jail forever, but, yes, we

8    agree in principle to that.

9                THE COURT:  Okay.  Mr. Kenerson, you can go ahead

10   and file that.

11               MR. KENERSON:  Thank you, Your Honor.

12               THE COURT:  All right.  Mr. Yeo, you are a very

13   intelligent young man who has made a mistake, a very serious

14   mistake.  I hope that you have learned from this.  I hope you

15   are able to eventually pick up the pieces of your life and that

16   your family is able to continue with their lives.

17       I often tell defendants that I sentence, and I believe it,

18   that you're not the worst thing you've ever done.  You're still

19   a young person.  I hope you've learned from this, and I hope you

20   are able to continue with the rest of your life.

21       I doubt you'll be allowed back into the United States, but

22   I hope that you take with you an appreciation for this country's

23   commitment to providing someone who has done what you have done

24   with due process.

25               THE DEFENDANT:  Yes.

1          THE COURT:  So I hope that you take that into

2   consideration.  But I wish you luck with your future, and I hope

3   you learn from this and can make something productive of your

4   life going forward.  Good luck.

5          THE DEFENDANT:  Yes, Your Honor.  I promise you I

6   will.  I really will.

7          THE COURT:  Mr. Kenerson, Mr. Saunders, Ms. Peterson

8   and Ms. Lustig, thank you all for your professionalism and hard

9   work on this case.  Is there anything else that you'd like me to

10  address today?

11         MS. PETERSON:  No, Your Honor.

12         MR. KENERSON:  No, Your Honor.  Just one more thing on

13  behalf of the government.  The plea agreement had been under

14  seal at this point.  As part of that agreement, we have moved

15  to unseal it, and the defense is not opposing it at the time of

16  sentence.  So we'd ask to unseal the addendum to the plea

17  agreement, which I believe is document 8, though I'm not a

18  hundred percent sure about that, at this time.

19         THE COURT:  Ms. Peterson?

20         MS. PETERSON:  That is without objection, Your Honor.

21         THE COURT:  All right.  It will be unsealed.  I don't

22  know if you need to file something, but I'm granting the request

23  on the record; so I shouldn't need anything in writing.  If

24  there's any confusion with regard to which document you're

25  referring to, just check with Mr. Bradley.

1                    MR. KENERSON:  Absolutely.  Thank you.

2                    THE COURT:  All right.  Thank you, everyone.

3       Good luck, Mr. Yeo.

4            (Proceedings adjourned at 12:10 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE *

       I, BRYAN A. WAYNE, Official Court Reporter, certify that the foregoing pages are a correct transcript from the record of proceedings in the above-entitled matter.

*Bryan A. Wayne*
BRYAN A. WAYNE

* PLEASE NOTE:

This hearing was taken via videoconference in compliance
with U.S. District Court Standing Order 20-19 during the
COVID-19 pandemic.  Transcript accuracy may be affected by
limitations associated with use of electronic technology,
including but not limited to any sound distortions and/or
audio/visual interferences.